[Cite as *State v. May*, 2025-Ohio-2378.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

VASHUAD DWAYNE MAY,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 24 MA 0085

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2023 CR 00870

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Lynn Maro,* Mahoning County Prosecutor, *Atty. Kristie M. Weibling,* Assistant Mahoning County Prosecutor, for Plaintiff-Appellee and

*Atty. Mark Lavelle,* for Defendant-Appellant.

Dated: June 25, 2025

**Robb, P.J.**

{¶1} Defendant-Appellant Vashuad Dwayne May appeals the judgment of the Mahoning County Common Pleas Court entered after a jury convicted him of aggravated murder and other offenses. He raises multiple issues on appeal including sufficiency of the evidence, weight of the evidence, the admission of his online rap video, a supplemental jury instruction on circumstantial evidence, the rejection of an incomplete stipulation on a prior conviction, and cumulative error. For the following reasons, the trial court's judgment is affirmed.

STATEMENT OF THE CASE

{¶2} On April 26, 2022 at approximately 5:20 p.m., Rawsheem Aponte was shot and killed while attempting to maneuver his vehicle away from shooters who had been chasing his car through various streets. Aponte's fiancee′ and their three-year old child survived after each was shot in the leg; the barrage of bullets missed their four-year-old child. A warrant was issued for Appellant's arrest on April 29, 2022. Although police actively searched for him in multiple jurisdictions, he was not apprehended until November 29, 2023 in Minneapolis, Minnesota. (Tr. 382).

{¶3} The January 25, 2024 indictment charged Appellant with aggravated murder (and the lesser included offense of murder), three counts of attempted murder (and the lesser offenses of felonious assault), all with firearm specifications. He was also indicted for having a weapon while under disability.

{¶4} At the jury trial, Aponte's fiancee′ testified she lived with Aponte on the west side of Youngstown with their two young children. On the day of the murder, Aponte was driving the family in his black Camaro toward Walmart in Pennsylvania but stopped at a house on the south side and spoke to a friend in the driveway. (Tr. 216-217, 220). Before Aponte rolled up his window to leave, his fiancee′ heard him say, "they almost killed me." (Tr. 218). She noticed a group of males in a neighboring driveway standing by two cars; she remembered one of the cars was white. (Tr. 218-219).

{¶5} As the family's Camaro approached the Center Street bridge, someone started shooting at them from another vehicle, prompting Aponte to turn right instead of left onto the bridge. (Tr. 220). Aponte's fiancee′ leaned into the backseat and pressed

the children down to protect them. (Tr. 222, 245). Upon calling his brother to figure out who was shooting at them, Aponte described one of the vehicles as purple. (Tr. 221). Believing they escaped the assault on their vehicle, Aponte's fiancee′ raised her head. However, she soon saw a white car coming from the right. When she asked if it was the shooters, Aponte answered in the affirmative as he sped past the white car and through a neighborhood. (Tr. 222-223, 248).

{¶6} Video evidence from two houses showed the Camaro speed up the street followed by a white car. (St.Ex. 80). However, that street, which appeared from a distance to be a through-street, was a dead-end with a small cul-de-sac; a photograph in evidence shows a view of a populated area with a gas station located just beyond rocks placed at the end of the street. (St.Ex. 19).

{¶7} Aponte came to a brief stop at the top of the street upon realizing they reached a dead-end. (Tr. 224). From the side-view mirrors, Aponte's fiancé saw two men alight from the white car behind them and start shooting at the back of the Camaro. (Tr. 226-227, 252-253). The fiancee′ jumped into the backseat to protect the children by laying across them (face-up) while Aponte put the Camaro in reverse and started driving backwards. (Tr. 226-227, 255). Home surveillance video showed the Camaro reversing down the street while taking gunfire but then spinning into a front yard just after a Y-intersection. (St.Ex. 80); (Tr. 368).

{¶8} At this point, the video from the house camera mounted nearest the vehicle's position showed one of the shooters run up to the passenger side of the vehicle, the nearest side to his approach. This shooter was clad in all black including a hat/hood with a mask portion covering his mouth. Firing with his left hand, this assailant shot into the vehicle from very close range using an assault rifle with a double drum magazine. (Tr. 355-356). He then leaned down and peered into the vehicle before running to the white car, which can be seen driving down from the direction of the cul-de-sac. (St.Ex. 80).

{¶9} From her position in the back seat, Aponte's fiancee′ watched this "left-handed" shooter run up to the car and shoot Aponte with "a rifle . . . A really big gun." (Tr. 228). She testified the shooter was 4 to 5 feet from her; he looked in the car at her and then fled when people started coming from their homes. (Tr. 228-229, 236, 259). She

believed she heard this shooter celebrating with his accomplices just before they drove off. (Tr. 261). At that point, she instructed her children to run, and they approached the residents of the house where their car stopped.

{¶10} Aponte's fiancee′ identified Appellant as the shooter from the stand. (Tr. 236). She testified although the shooter wore a partial mask, she knew it was Appellant; she placed emphasis on his eyes, including their shape and position. (Tr. 236, 256, 269). She knew who Appellant was prior to the shooting, having seen him in the community approximately four times and in various online rap videos. (Tr. 234, 239-241). One or two days before the shooting, she watched one of Appellant's videos multiple times. (Tr. 268).

{¶11} Aponte's fiancee′ also said Appellant and Aponte had some prior issue or argument. She recalled an encounter when Aponte's vehicle was stopped on the road while Appellant, who was pumping gas, "locked eyes" with Aponte. (Tr. 235-236, 238-239). She pointed out she did not have to personally know Appellant to know who he was and what his face looked like prior to the shooting. (Tr. 268). When asked why she did not name Appellant as the shooter to the first responders at the scene, Aponte's fiancé explained it was chaotic, Aponte had just died violently in front of her children, and she and her daughter were awaiting emergency care before being transported to the hospital. (Tr. 231).

{¶12} As stipulated, Aponte died from gunshot wounds to the head and chest; one bullet entered from the front of the head and another bullet traveled across the front of his body. (Tr. 452); (St.Ex. 93). Aponte's fiancee′ suffered a gunshot wound to the leg. The bullet could not be removed. (Tr. 230, 232). Their four-year-old child did not get hit with a bullet. However, their three-year child suffered a gunshot wound to the thigh for which she received stitches. (Tr. 230, 232).

{¶13} One of the first officers to arrive at the scene testified to the hectic scene with multiple bystanders; someone handed him the child who had been shot. (Tr. 194-195). Another officer testified to assisting with this child, who was crying and who declared her dad was dead. (Tr. 202-203). His body cam video showed his arrival at the scene, his opening of the Camaro's passenger door, the application of a tourniquet to the

child's thigh, and the making of a decision to transport the child by cruiser at which point the ambulance arrived.  (St.Ex. 3).

**{¶14}** At the hospital, the detective briefly spoke to Aponte's fiancee′.  He said she was a "wreck" and hard to question; however, she described two cars chasing them, said Aponte had been having trouble with certain people, and provided Appellant's last name (May). (Tr. 357-358).  The detective was later directed to a video wherein Aponte seemed to mock the death of a prior shooting victim.  (Tr. 401).

**{¶15}** Two days after the shooting, Aponte's fiancee′ called the detective to schedule her formal interview.  Upon arriving at the police station, she named Appellant Vashuad May as the shooter and showed the detective a rap video posted online for public viewing five days before the murder.  (Tr. 233, 373).   The rap video was admitted as an exhibit and played at trial. (St.Ex. 85).  In the video, Appellant holds a large assault rifle with a double drum magazine and points it in a left-handed manner (with the stock at his left shoulder and his left hand at the trigger position).  (Tr. 376).

**{¶16}** The crime scene investigator testified about photographing the evidence. At the mouth of the cul-de-sac, forty-eight shell casings were recovered:  twenty-six were .223 caliber; nineteen were .330 caliber (Blackouts); and three were 7.62x39 caliber.  In the grass of the devil strip on the passenger side of the vehicle, which was to the right of where the final shooter was standing (in the video), the police recovered seven .223 casings.  (St.Ex. 5); (St.Ex. 8).  The investigator noted it was standard for such casings to eject six to eight feet to the right of a shooter.  (Tr. 291-292).

**{¶17}** On the road near the Center Street bridge where the chase began, the police recovered fourteen .223 shell casings spanning approximately fifty yards along the street.  (Tr. 296-300).  Photographs of the Camaro showed multiple bullet holes through various windows.  As to forensic swabs of the casings, some resulted in the recovery of no DNA profile and some resulted in the recovery of DNA that was not of sufficient quality for comparison due to insufficient data.  (Tr. 325-329); (St.Ex. 78).  The BCI scientist explained various factors influencing the recovery of DNA.  (Tr. 327-329, 335-337, 343).

**{¶18}** In addition to surveillance video from the house where the Camaro came to rest, the police obtained surveillance video from a house further down this street, which was a house where three vehicles converged less than fifteen minutes before the final

shooting. First, a white car (white car 1) backed into the driveway of this gathering house; the features of this car did not match those shown in the surveillance video from the site of the Camaro or from a later-recovered white rental car. Three passengers exited white car 1 at different points. One removed a long gun from the vehicle and placed it down the leg of his sweatpants while another carried what appeared to be a long gun under a jacket he was carrying.

{¶19} Soon, a Dodge Charger (appearing to be a metallic copper-orangish shade) arrived at the gathering house. After waiting for the Charger to reverse into the driveway, a second white car (white car 2) pulled in the driveway. White car 2 quickly reversed out of the driveway and traveled back down the street.

{¶20} The driver of the Charger, wearing a white or light-colored hood with his face briefly angled toward the camera, spoke to some of the passengers from white car 1. The Charger then backed out and waited as white car 1 left the house without the three former passengers. After conferring with some of those passengers again, the Charger left as well.

{¶21} The video from the gathering house also shows the three passengers from white car 1 sitting on the porch, entering the house, and then exiting the house after the shooting while other neighbors were gathering on the street. This video also depicts a white car chasing a black car up the street in the distance. After the final shooting, the Charger can be seen heading *toward* the scene and then turning away. Collectively, the videos suggest neither the Charger nor white car 1 were in the cul-de-sac during the trapping of and final assault on the Camaro.

{¶22} The police received information on a white Chevy Malibu, which had been rented from a car rental company; the original renter (who re-rented it) reported it stolen after being contacted by police. OnStar located the vehicle in a garage and activated the horn after police arrived. (Tr. 369-370). The resident of that house gave consent to search, and police found her son's birth certificate, who was a different person with the last name May. (Tr. 371, 405). Photographs of this white Chevy Malibu depict a bullet hole through the passenger side mirror. (St.Ex. 72-73); (Tr. 306).[1] Most of the forensic

---

[1] Comparing the videos and photographs, it can be ascertained white car 1 was not the white rental car, which had details consistent with the white car the final shooter entered by the Camaro scene.

swabs from the white Malibu contained DNA that was "not of sufficient quality for comparison due to insufficient data"; one swab had no DNA profile. (Tr. 335).

{¶23} The police found the copper Charger parked on a street; the vehicle was also described as gold or burgundy. (St.Ex. 65-67); (Tr. 372). Scratches with white paint transfer marks are visible along the passenger side of the Charger. A mixture of DNA was recovered from the steering wheel of the Charger, and the major contributor was identified as the person to whom the vehicle belonged. His DNA was recovered from an additional swab of this vehicle while other swabs or profiles were not of sufficient quality, had no DNA, or had unknown male DNA. (Tr. 329-335, 400).

{¶24} When executing a warrant at the house of the person associated with the Charger, the police recovered shoes described as "red and black Jordans" which is what a witness at the scene reported seeing on one of the two shooters in the cul-de-sac area. (Tr. 400). One of the shooters at the top of the street with the cul-de-sac was reported to be bigger and one was reported to be smaller. The detective testified the Charger owner's larger physique did not match that of the final shooter observed in the video of the Camaro. (Tr. 410-411, 428).

{¶25} Appellant made various phone calls from jail in the weeks after his arrest. The detective summarized one of Appellant's declarations about Aponte's fiancee′ wherein Appellant declared her statement "ain't making sense . . . the only thing they have is her and they are going to pin her ass up, so you ain't even got her . . ." (Tr. 387); (St.Ex. 90). The detective also identified a certified copy of Appellant's 2016 juvenile adjudications, pointing to felony offenses of violence barring future firearm possession. (Tr. 390-391).

{¶26} The defense presented the testimony of an expert on eyewitness identifications. He explained the factors influencing memory related to identifying a person after an event. (Tr. 465-485).

{¶27} The jury found Appellant guilty of all counts. After merger, the court sentenced Appellant to life without parole for aggravated murder along with consecutive sentences on the three counts of attempted murder, one firearm specification, and the count of having a weapon while under disability. Appellant filed a timely appeal from the September 16, 2024 sentencing entry.

Case No. 24 MA 0085

## ASSIGNMENT OF ERROR ONE

{¶28} Appellant sets forth six assignments of error, the first of which contends: "Defendant-Appellant's conviction was not supported by sufficient evidence."

{¶29} Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The standard for reviewing the sufficiency of the evidence to support a criminal conviction on appeal is the same as the standard used to review the denial of a motion for acquittal. *See State v. Williams*, 74 Ohio St.3d 569, 576 (1996); Crim.R. 29(A) (motion for judgment of acquittal based on insufficient evidence). An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if it is believed. *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001). Hence, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins* at 390 (Cook, J., concurring).

{¶30} In reviewing the sufficiency of the evidence, the court views the evidence, including reasonable inferences, in the light most favorable to the prosecution to ascertain whether a rational juror could have found the elements of the offense proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 138 (1998); *see also State v. Filiaggi*, 86 Ohio St.3d 230, 247 (1999) (reasonable inferences are viewed in favor of the state); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (consider all evidence in the light most favorable to the prosecution, including reasonable inferences). Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001).

{¶31} Appellant challenges the sufficiency of the evidence as to his identity. He refers to a lack of DNA evidence connecting him to any of the casings and says the rap video was speculative circumstantial evidence about a similar firearm. He discounts the testimony of Aponte's fiancee′, emphasizing her failure to name a shooter at the scene and her failure to specifically name him as the shooter at the hospital when telling the detective his last name. He believes her naming him as the shooter during the formal interview was based on hearsay she later heard and her viewings of the rap video after the shooting.

**{¶32}** However, Aponte's fiancee′ testified she watched the rap video multiple times in the day or two *before* the shooting. (Tr. 268). She also watched his other rap videos in the past and explained she knew who Appellant was, both from the videos and from past encounters in the community. (Tr. 234, 239-241). After describing the chase while under fire, Aponte's fiancee′ testified they thought they escaped until she saw a white car approach from an intersection. They were followed up a street until they reached the dead-end where two shooters from the white car exited and started shooting at the back of their Camaro. She jumped into the backseat to protect the children while Aponte reversed their Camaro down the hill past the shooters. We incorporate our Statement of the Case set forth above for a more detailed recitation of the facts.

**{¶33}** As can be seen in a video of the final shooting, one of the shooters chased the reversing Camaro on foot, ran to the passenger side, assumed a firing position very near the passenger window, and fired shots at the window from a long assault rifle with a double drum magazine using his left hand on the trigger. These and other features of the gun and the shooter were similar to those in the rap video released to the public online a mere five days prior to the shooting. Aponte's fiancee′ testified she recognized Appellant as the shooter, saying he was only four or five feet from her position in the back seat of the vehicle. And, the video of the shooting depicts the shooter leaning down and closely peering into the vehicle after the final shooting and before fleeing into the waiting white car.

**{¶34}** In voicing her confidence of her identification, Aponte's fiancee′ spoke of Appellant's eyes and her prior viewing of him. The fact that he wore a partial mask or the fact that she did not immediately name him did not render her testimony inadequate. Likewise, the absence of DNA on fired shell casings or in a borrowed rental car occupied as a passenger do not render the case against him legally inadequate. Most of Appellant's arguments sound in weight of the evidence rather than sufficiency, as they deal with credibility and assigning weight to the various pieces of evidence presented. We discuss this subject in the next assignment of error.

**{¶35}** For a sufficiency review, the question is merely whether "any" rational trier of fact could have found the contested element satisfied beyond a reasonable doubt. *State v. Getsy*, 84 Ohio St.3d 180, 193 (1998), quoting *Jackson*, 443 U.S. at 319. As

pointed out above, reasonable inferences are evaluated in the light most favorable to the prosecution, and circumstantial evidence is no less important than direct evidence. *Goff*, 82 Ohio St.3d at 138; *Filiaggi*, 86 Ohio St.3d at 247; *Treesh*, 90 Ohio St.3d at 485. Contrary to Appellant's argument, a rational juror could conclude beyond a reasonable doubt that he was the shooter who ran after the Camaro as it reversed down the street while taking gunfire and who ran up to the Camaro and fired additional shots at the driver. Accordingly, the trial court did not err in denying Appellant's motion for acquittal. As there was sufficient evidence regarding Appellant's identity, this assignment of error is overruled.

## ASSIGNMENT OF ERROR TWO

{¶36} Appellant's second assignment of error alleges:

"Defendant-Appellant's conviction was against the manifest weight of the evidence."

{¶37} Weight of the evidence concerns the effect of the evidence in inducing belief, and our corresponding review evaluates "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. The appellate court considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the state's burden of production involved in a sufficiency review).

{¶38} When a defendant argues a conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶39} It is the trier of fact who occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

"We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible." *State v. Carter*, 2017-Ohio-7501, ¶ 105 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

**{¶40}** Furthermore, where a case was tried by a jury, only a unanimous appellate court can reverse on manifest weight of the evidence grounds. Ohio Const., art. IV, § 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Thompkins* at 389.

**{¶41}** The identification testimony of Aponte's fiancee′ is challenged here (and under the prior assignment of error). The jury saw the scene was chaotic from the house video showing her ushering her four-year-old and three-year-old to shelter and from a subsequent body cam video. When asked why she did not immediately provide Appellant's name, Aponte's fiancee′ explained the stress she was under after the shooting. Again, this was after a chase during which an enormous amount of gunfire had been directed to their vehicle and ending with Aponte being shot in the head and chest as or after he drove backward with her and their children in the backseat. Moreover, she had a bullet lodged in her leg and was waiting for medical care for herself and for her three-year-old child, who had a bullet wound to the thigh.

**{¶42}** At the hospital, she provided the detective with Appellant's last name when speaking of people who had issues with Aponte. The shooting occurred around 5:20 p.m., and she was released from the hospital the same day; this conversation with the detective thus occurred fairly soon after the shooting. The detective explained the conversation was brief and Aponte's fiancee′ was a "wreck" and hard to speak with; her shock and distress were understandable. She called the detective two days later (with a borrowed phone as the police had her phone). She then came to the station for a formal interview at which she confidently named Appellant as the shooter. Her testimony explained her prior viewing of Appellant both in the community and in rap videos. In a convincing and rational manner, she insisted she knew who Appellant was prior to the shooting.

**{¶43}** The jury considered the testimony of the defense expert on eyewitness identification. He educated the jury on relevant factors for encoding, storage, and retrieval along with the constructive process of memory. It was within the jury's domain to choose to believe the identification testimony of Aponte's fiancee′ and conclude Appellant was the shooter captured on the video played for the jury at trial. Again, we incorporate our Statement of the Case above for a more detailed recitation of the testimony and evidence presented to the jury.

**{¶44}** Corroborating evidence was not required in order to validate the identification testimony of Aponte's fiancee′, who was an eyewitness to the murder and a shooting victim herself. Nor must the state recover physical evidence to convince the jury. For instance, it is not concerning that the murder weapon was not found or that Appellant's DNA was not recovered from a fired shell casing or on swabs from the white rental car. The jury heard the testimony about the inability to find DNA from anyone (or the insufficient quality of DNA) on the casings and the white rental car, and the expert explained the factors affecting the ability to recover usable DNA.

**{¶45}** Appellant's rap video released five days before the shooting portrayed him holding a large assault rifle with a double drum magazine and taking a firing position in a left-handed manner. The state was not required to prove the gun in the video was not a fake gun. Contrary to Appellant's suggestion, the evidence did not weigh against him due to the allegation the state presented an "incomplete narrative" by failing to identify or explain the others involved in the chase as principals or complicitors.

**{¶46}** In summary, it was within the jury's province to weigh the evidence and assign value to it. After reading the transcripts and reviewing the videos played to the jury, we cannot conclude this is the exceptional case where the jury lost its way and created a manifest miscarriage of justice so as to require a new trial. This assignment of error is overruled.

ASSIGNMENT OF ERROR THREE

**{¶47}** Appellant's third assignment of error provides:

"The court admitting the Defendant-Appellant's YouTube rap video violated his First Amendment Rights."

Case No. 24 MA 0085

**{¶48}** Relevant evidence is defined as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Irrelevant evidence is inadmissible while relevant evidence is admissible except as otherwise provided by the federal or state constitution, state statute, or specified rules. Evid.R. 402.

**{¶49}** Appellant points out: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). In addition to claiming prejudice under Evid.R. 403(A), Appellant notes relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).

**{¶50}** As the Supreme Court has explained, the weighing of the probative value of evidence against the reasons in the rule to limit admission of evidence entails a judgment call to be exercised by the trial judge and is reviewed for an abuse of discretion. *State v. Brinkman*, 2022-Ohio-2550, ¶ 40. In reviewing for an abuse of discretion, we evaluate whether the court's attitude was unreasonable, arbitrary or unconscionable without substituting our judgment for that of the trial court. *State v. Herring*, 94 Ohio St.3d 246, 255 (2002), citing, *e.g.*, *State v. Palmer,* 80 Ohio St.3d 543, 566 (1997) (the trial court did not abuse its discretion by admitting the defendant's gun as demonstrative evidence where it had features matching the missing murder weapon).

**{¶51}** In addition to reiterating the defense argument made below that the rap video was overly prejudicial, Appellant generally asserts the use of the rap video in his criminal trial violated his freedom of speech and association, pointing out artistic expression through music falls within the protections of the First Amendment, a topic not raised to the trial court. In a case he cites, it was observed the First Amendment prohibits introduction of "a defendant's abstract beliefs . . . when those beliefs have no bearing on the issue being tried." *Dawson v. Delaware*, 503 U.S. 159, 168 (1992).

**{¶52}** However, the mere fact that evidence includes speech does not necessarily invoke First Amendment protections, and evidentiary items expressing First Amendment rights can be used to prove an element of an offense, including identity, as well as other relevant subjects in a criminal case. *See generally Wisconsin v. Mitchell*, 508 U.S. 476,

489 (1993) ("The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."). We also point out the lyrics were not mentioned by the defense to the trial court or quoted on appeal to show prejudice and were not emphasized by the state's questioning or arguments at trial. (Tr. 15-18, 179, 374-377, 495, 501). Principles of speech and expression were not discussed below, and there is no indication any unspecified speech or Appellant's association with other participants in the video would have been outcome determinative in this case. *See* Evid.R. 103(A)(1) (error may not be predicated on a ruling admitting evidence unless a substantial right was affected and a timely objection specifies the ground of objection).

**{¶53}** The state cites various cases upholding the admission of music videos under state evidentiary rules and emphasizes a federal circuit court case rejecting both First Amendment and evidentiary challenges to the use of a music video. In the cited federal case, the appellate court pointed out the video corroborated identification testimony by a victim who watched the video prior to the robbery and it showed the defendant with a gun similar to the one used to assault the victim and similar to one visible in surveillance videos. *United States v. Smith*, 967 F.3d 1196, 1204-1206 (11th Cir. 2020)

**{¶54}** In arguing a rap video should be inadmissible unless the specific crime at issue is mentioned in the lyrics, Appellant cites a New Jersey case. In the cited portion of the case, the court generally mentioned the inquiry should be whether the evidence served any valid purpose while viewing the nexus of the item to the offense and then specifically focused on the allegation by the state about the content of the lyrics as autobiographical evidence as opposed to being mere fictional expressions. *State v. Skinner*, 218 N.J. 496, 525 (2014).

**{¶55}** Here, however, the state asked to play the rap video to show Appellant's possession of a distinctive firearm, to show how he holds an assault rifle, and to show how the victim's identification of Appellant was assisted by her prior viewing of this video. Specifically, the firearm brandished by Appellant in the rap video had features matching the one used by the shooter in the surveillance video showing the shooting of the car from

close range.  Both videos showed a large assault rifle with a double drum magazine and a light-colored or metallic banding.  Similar to the shooter in the surveillance video, the rap video shows Appellant shouldering the rifle on his left shoulder using his left hand at the trigger position and using his right hand for the steadying position on the barrel.  And, the rap video was released to the public online five days before the shooting.

**{¶56}** Moreover, the murder victim's fiancee′, who was a victim of attempted murder in this case, testified Appellant was the shooter.  The defense disparaged her credibility and her identification abilities.  Yet, she specifically testified to watching Appellant's rap video in the days prior to the shooting.  It was partly from previously viewing Appellant's video that this eyewitness recognized Appellant as the shooter as he stood over and fired into their disabled vehicle.  The video was relevant, and a strong nexus was established for the purposes discussed.

**{¶57}** In addition, the rap video would not confuse the issues or mislead the jury.  On the topic of prejudice, the expected function of the prosecution is to present evidence at trial that is unfavorable to the defendant.  Notably, "it is only *unfair* prejudice to be weighed against the probative value, as the state's evidence will obviously prejudice a defendant." *State v. Malvasi*, 2022-Ohio-4556 ¶ 65 (7th Dist.).  As explained above, the outlined features of the rap video had a very high probative value.  Any unfair prejudice from the evidence did not "substantially" outweigh the probative value as required by Evid.R. 403(A).  Nor was the probative value substantially outweighed by any claim the video was needlessly cumulative, and exclusion is permissive under division (B) of Evid.R. 403 in any event.

**{¶58}** In sum, the trial court did not abuse its discretion in applying evidentiary rules and did not err in failing to sua sponte consider First Amendment principles.  Accordingly, this assignment of error is overruled.

ASSIGNMENT OF ERROR FOUR

**{¶59}** Appellant's fourth assignment of error contends:

"The Court err[ed] when it attempted to clarify the meaning of circumstantial evidence to the jury."

**{¶60}** Appellant challenges a portion of the trial court's response to the jury's request for clarification on what constitutes circumstantial evidence.  After pointing out

the legal definition was in the instructions the jury already possessed, the court nevertheless provided an example about a mother leaving a cherry pie unattended in a house with two children and returning home to find the partially eaten pie, one child with cherry pie on his face, and the other child with nothing on his face. The court explained although the disturbance of the pie was not witnessed, one could conclude the first child was eating the pie. Appellant agrees this is "the typical scenario" often provided to a jury.

**{¶61}** The trial court then added: "The other kid, although there's no cherry pie on him, you could, because you know these kids and you know that one of them - - one of them eating cherry pie, the other one would be tempted to do that, you could logically conclude he did, too, but he cleaned up." (Tr. 569). Appellant argues this went so far beyond the typical example that it constituted a misstatement of the law by allowing stacked inferences without evidence about the second child with regards to the pie (besides proximity/opportunity). He says this portion of the supplemental jury instruction prejudiced his defense by leading the jury to conclude that despite the lack of DNA evidence he was like the second child and must have "cleaned up" his involvement.

**{¶62}** However, immediately after making the now-challenged comment about the second child, the court continued: "It's not -- circumstantial evidence is -- is of equal weight to direct evidence, but what it is, is it allows you the ability as a human being, to figure things out without being actually told what happened. You have to have some basis for that. So you can't just make it up. There has to be some factual basis that allows you to then get to the next spot." (Tr. 569-570) (and then spoke of connecting logical dots, while referring a connect-the-dots picture). We note the basis in this particular case was a victim's eyewitness identification testimony. The court additionally advised the jury direct and circumstantial evidence were of equal value. (Tr. 570).

**{¶63}** A contested jury instruction must be read in context, as we do not evaluate isolated pieces of an overall charge. *State v. Jones*, 91 Ohio St.3d 335, 348-349 (2001). In answering the jury question, the court additionally directed the jury to the main jury instructions, which were approved by the parties before the charge was read and sent to the jury room prior to deliberations. (Tr. 524-525, 568). Those instructions contained standard language from Ohio Jury Instructions on circumstantial evidence and inferences. Those instructions also referred back to a prior example of rabbit tracks in the snow

Case No. 24 MA 0085

provided by the court in its initial instructions during voir dire. In speaking of circumstantial evidence and inferences, the court mentioned a scenario where a person saw a blanket of untouched snow in their yard at one hour and rabbit tracks in the snow at a later hour, which would allow the person to logically and reasonably conclude a rabbit crossed their yard sometime between those hours. The court also pointed out one could not logically and reasonably conclude it happened at a precise time between those hours without additional facts. (Tr. 41-42).

**{¶64}** The Supreme Court has previously concluded a trial court's response to a jury question on the law did not warrant reversal because "defense counsel raised no objection to the trial court's response to the jury question, and the court acted within the scope of its discretion in view of the nature of the instructions previously given." *State v. Carter*, 72 Ohio St.3d 545, 553 (1995). When a timely objection is made, the court has the opportunity to amend or strike its contested explanation, whether to cure the alleged error or to err on the side of caution. The defense is not to sit on objections until after a verdict is rendered. *State v. Glaros*, 170 Ohio St. 471, 475 (1960) (otherwise counsel would be able "to place his client in a position where he could take advantage of a favorable verdict and, at the same time, avoid an unfavorable verdict merely because of an error of the trial judge that counsel made no effort to prevent . . . when such error could have been avoided."). It is a well-established "general rule that an appellate court will not consider any error which counsel . . . could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *Id.* at paragraph one of the syllabus. Here, the defense did not object to the trial court's supplemental instruction in response to the jury's question on circumstantial evidence. (Tr. 568-569) (with the record showing Appellant and his attorney were present during the court's supplemental instruction).

**{¶65}** Crim.R. 52(B) provides plain errors affecting substantial rights may be noticed although they were not brought to the attention of the court. To establish plain error, the defendant must demonstrate an obvious error which affected the outcome of trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." *State v.*

*Rogers*, 2015-Ohio-2459, ¶ 22.  Plain error is a discretionary doctrine the appellate court may choose to use only with the utmost care in exceptional circumstances when required to avoid a manifest miscarriage of justice.  *State v. Noling*, 2002-Ohio-7044, ¶ 62.

**{¶66}** We note although it has been observed the fact-finder is not to draw an inference based solely off another inference where it is not supported by an additional fact or by another inference from other facts, it is permissible for an inference to be partially based on another inference and partially based on a fact established by testimony.  *State v. Cowans*, 87 Ohio St.3d 68, 78 (1999).  Even when improper inference stacking exists and where an objection was presented below, the issue can be harmless error.  *Id.* at 80.

**{¶67}** Reading the contested portion of the supplemental jury instruction in the context of the court's answer to the jury's question and in context of all instructions on circumstantial evidence and inference, any confusion was mitigated.  An obvious error is not calling for our discretionary attention, and a reasonable probability of prejudice is not apparent.  Circumstantial evidence inherently possesses the same probative value as direct evidence.  *Treesh*, 90 Ohio St.3d at 485.

**{¶68}** The inferences to which Appellant cites, such as the lack of DNA on fired casings or the white car, were either permissible from common sense or based on direct facts (such as the scientist's testimony on DNA recovery or the surveillance video clearly showing the shooter wore a mask and hood/hat).  *See, e.g., State v. Nevius*, 147 Ohio St. 263, 265 (1947) (natural reason drawn from proven facts).  A person's ability to use care when touching ammunition while loading a gun, gunfire damage to DNA, and cleaning a car after using it were standard factors related to the failure of DNA recovery efforts, rather than improper inferences, and were extraneous to the main issues in this case. (No usable DNA was recovered from the shell casings or the white rental car, but clearly someone loaded the gun and used the car in the past.)  This assignment of error is overruled.

ASSIGNMENT OF ERROR FIVE

**{¶69}** Appellant's fifth assignment of error argues:

"The Court abused its discretion by refusing to accept the defendant's stipulation that he was previously adjudicated a delinquent child."

Case No. 24 MA 0085

{¶70} Appellant was charged with the offense of having a weapon while under disability for knowingly acquiring, having, carrying, or using a firearm even though he "has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence." R.C. 2923.13(A)(2) (unless relieved from disability). This quoted portion is known as the "status element."

{¶71} An offense of violence is defined as including violations of R.C. 2903.11 (felonious assault) and R.C. 2903.13 (assault). R.C. 2901.01(A)(9)(a). An offense of violence also includes a "conspiracy or attempt to commit, or complicity in committing, any offense under division (A)(9)(a), (b), or (c) of this section. . ." R.C. 2901.01(A)(9)(d).

{¶72} A certified copy of a 2016 final adjudication order was introduced during the detective's testimony. (Tr. 390-391); (St.Ex. 92). In 2015 JA 1702, Appellant was adjudicated delinquent for committing the offense of attempted felonious assault, a third-degree felony violation of R.C. 2903.11 and R.C. 2923.02 (attempt). In 2016 JA 449, he was adjudicated delinquent for committing the offense of assault, a fifth-degree felony in violation of R.C. 2903.13.

{¶73} Prior to the start of trial, the defense asked the court to accept a stipulation stating, "the defendant agrees that he was previously adjudicated a delinquent child for the commission of an offense that prohibited him from acquiring, having, carrying, or using a firearm" (while emphasizing the state would still have to prove he knowingly acquired, had, carried, or used a firearm at the time of the indicted offenses). (Tr. 18). The trial court pointed out the aforequoted language would not fully satisfy the status element as it did not track the statutory language regarding a felony or an offense of violence, e.g., "adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence." (Tr. 20-21).

{¶74} The trial court explained the case law on the subject and distinguished the stipulations in other cases from Appellant's proposed stipulation, which failed to match the statutory language on the status element. (Tr. 21-23). The court suggested the defense amend the instruction to match the statutory language in accordance with the court's explanation. (Tr. 24). However, defense counsel informed the court the defendant did not wish to fully stipulate that his prior adjudication was an offense of violence and

acknowledged the state would have to go forward on proving a relevant prior adjudication. (Tr. 23-24).

**{¶75}** Appellant now claims the trial court erred in taking this position and refusing to accept the stipulation as written. He relies on the decision in *Creech* wherein the Ohio Supreme Court adopted the rationale of the United States Supreme Court's *Old Chief* case. *State v. Creech*, 2016-Ohio-8440, ¶ 1, citing *Old Chief v. United States*, 519 U.S. 172 (1977). In *Old Chief*, a federal evidentiary rule weighing unfair prejudice was applied to conclude the trial court should have accepted a defense stipulation on a prior conviction. *Old Chief* at 191-192. In so holding, the United States Supreme Court observed, "[t]he most the jury needs to know is that the conviction admitted by the defendant falls within the class of crimes that Congress thought should bar a convict from possessing a gun . . . ." *Id.* at 190-191.

**{¶76}** Applying Evid.R. 403(A), the Ohio Supreme Court found *Old Chief* persuasive authority when considering whether the trial court should have accepted a defense stipulation on a prior conviction where the defendant was on trial for violating Ohio's having a weapon while under disability statute. *Creech* at ¶ 31, 35. At that time, the status element could be satisfied (among other options) by a prior conviction for "any felony offense of violence" or "any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse . . . ." Former R.C. 2923.13(A)(2)-(3).

**{¶77}** While adopting *Old Chief*'s reasoning, the Ohio Supreme Court noted the differences between R.C. 2923.13(A) and the federal statute. *Creech* at ¶ 35. "What mattered for purposes of the federal statute is that the defendant had been sentenced to a crime punishable with a sentence of more than a year in prison." *Id.* Distinctly, "What matters to the [Ohio] General Assembly—and an element that the state must prove—is that the crime the defendant was convicted of was either a 'felony offense of violence' or "felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse." *Id.* (noting Ohio's statute referred to felony offenses of violence and felony drug offenses rather than the "generic felonies" in the federal statute defining the offense in *Old Chief*).

Case No. 24 MA 0085

**{¶78}**  The Ohio Supreme Court concluded it was highly prejudiced in the *Creech* case to reveal to the jury a criminal record specifying the prior offense of felonious assault with a deadly weapon (which specified he shot at his victim) and to name specific drug offenses rather than to merely accept a stipulation that the defendant had the status set forth in the statute defining the offense of having weapons while under disability.   *Id.* at ¶ 36-37.  The Court also found the probative value of the specific convictions low due to the stipulation on the status element, and concluded the unfair prejudice substantially outweighed the probative value.  *Id.* at ¶ 38-39.

**{¶79}**  As the trial court here pointed out, the decision in *Creech* was made in the context of a stipulation containing a "generalized description of the disability *as set forth in the statute*."  (Emphasis added.)  *Id.* at ¶ 37.  The Ohio Supreme Court specified, "In regard to R.C. 2923.13, a stipulation or admission concerning the status element would necessarily include the fact that the defendant was under indictment or had previously been convicted of a crime falling within those broad categories" one of which was "felony offense of violence" (the portion of the status element at issue here).  *Id.* at ¶ 35.  In remanding, the Supreme Court instructed the trial court to accept stipulations as to each count "either *that he has been convicted of a felony offense of violence* or that he has been convicted of or indicted for a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse."  (Emphasis added.)  *Id.* at ¶ 41.

**{¶80}**  The *Creech* holding does not require a trial court to accept a stipulation saying the defendant "was previously adjudicated a delinquent child for the commission of an offense that prohibited him from acquiring, having, carrying, or using a firearm" where R.C. 2923.13(A)(2)'s pertinent status element "has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been *a felony offense of violence*."  (Emphasis added.)  Consequently, Appellant's argument is without merit.

ASSIGNMENT OF ERROR SIX

**{¶81}**  Appellant's sixth and final assignment of error alleges:

"The cumulative errors committed in this case deprived Appellant of a fair trial."

**{¶82}** A cumulative error analysis cannot be commenced if there were not multiple instances of error that were individually found to be harmless. *State v. Hunter*, 2011-Ohio-6524, ¶ 132. Even when a court finds multiple instances of harmless error, such harmless errors do not become prejudicial by sheer weight of numbers. *State v. McKelton*, 2016-Ohio-5735, ¶ 322. Under the cumulative error doctrine, a conviction is reversible only when a reviewing court is convinced the cumulative effect of errors in a trial deprived the defendant of a fair trial, even though each instance of error was individually found harmless. *Id.* at ¶ 321-322.

**{¶83}** Some of Appellant's contentions here are essentially questions of weight and sufficiency disposed of in the first and second assignments of error, rather than errors that could be found harmless. For instance, he states the eyewitness was not credible, the forensic evidence was weak, and the state presented an incomplete narrative. He also says the state relied on speculative circumstantial evidence, pointing to the rap video, which we evaluated in assignments of error one, two, and three.

**{¶84}** In addition, Appellant alleges the trial court's questioning of the DNA expert was improper, claiming it resulted in a suggestion the absence of DNA may be due to the acts of the participants. (Tr. 343) (asking if the lack of DNA at a crime scene excludes a person from being involved and if a person could prevent DNA recovery by masking, gloving, or not touching an area that was swabbed with the expert agreeing and pointing out that is also a reason why the lab workers wear lab coats, gloves, and face masks). However, the trial judge "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . make the interrogation and presentation effective for the ascertainment of the truth . . ." Evid.R. 611(A). "The court may interrogate witnesses, in an impartial manner, whether called by itself or by a party." Evid.R. 614(B). There was no objection to the court's question of the DNA expert as required by Evid.R. 614(C). In any event, the court did not disparage the expert's credibility or show favoritism toward the expert. The court asked a reasonable, unbiased question about DNA recovery factors and did not commit error.

**{¶85}** Lastly, Appellant points to his argument about the trial court's refusal to accept his stipulation for the status element of the offense of having a weapon while under disability. As set forth in assignment of error five, the court did not err in rejecting a non-

conforming and thus ineffectual stipulation as a substitute for the status element of that offense.

**{¶86}** There were not multiple harmless errors here, and thus, there can be no cumulative error.  We additionally observe that even if we had found more than one error but labeled those errors as harmless, there is no indication the cumulative effect of those allegations would have deprived Appellant of a fair trial.  This assignment of error is without merit.

**{¶87}** For the foregoing reasons, Appellant's convictions are upheld, and the trial court's judgment is affirmed.

Waite, J., concurs.

Dickey, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**